UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE BUNGALOW SERIES IV TRUST<br>     Plaintiff,<br><br>v.<br><br>DAVID IASCONE<br>CINDY A. IASCONE<br>WASHINGTON INTERNATIONAL INSURANCE COMPANY<br>DEPARTMENT OF ADMINISTRATION DIVISION OF TAXATION<br>LIEN SOULUTIONS<br>JOHNSTON ZONING BOARD OF REVIEW<br>     Defendant(s) | Civil Action No. |

**<u>COMPLAINT</u>**

<u>Jurisdiction and Venue</u>

The Superior Court has jurisdiction over this matter pursuant to R.I.G.L. § 8-2-13,

R.I.G.L. § 8-2-14 and R.I.G.L.  34-27-1, et seq.

1.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §

1332(a)(1) since there is complete diversity between Plaintiff and all Defendants and the

amount in controversy exceeds $75,000.00.

2.     Venue is proper under 28 U.S.C.  § 1391(b)(2) since the real property that is

subject to this complaint is located in the State of Rhode Island.

3.      Plaintiff seeks to foreclose a mortgage to Plaintiff pursuant to R.I.G.L. § 34-27-1, et seq.


Parties

4.      Plaintiff U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust has a usual place of business at 300 Delaware Avenue, 9th Floor, Wilmington, DE 19001 (the "**Plaintiff**").

5.      David Iascone and Cindy A. Iascone (the "**Defendants**") are individuals who, upon information and belief, reside at 220 Cherry Hill Road, Johnston, RI (the "**Property**").

6.      The Property is further described by the City of Johnston Tax Assessors as Lot 303, Plat 20."

**Facts**

7.      Cherry Hill Development executed and delivered a warranty deed for the Property to Defendants David Iascone and Cindy A. Iascone as tenants by the Entirety, which deed is dated June 15, 1988 and was recorded on June 23, 1988 in Land Evidence Records for the Town of Johnston at Book 213 at Page 785.  *See* **Exhibit A**.

8.      There is an unbroken chain of title of not less than 40 years, which creates marketable record title in Defendant pursuant to R.I.G.L. § 34-13.1-2.  See **Exhibit B**.

9.      Defendants David Iascone and Cindy A. Iascone executed and delivered a note dated March 21, 2005 to Ameriquest Mortgage Corporation in the original principal amount of $403,000.00 (the "**Note**").  See **Exhibit C**.

10.     The note was endorsed in blank.

11.     U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust is the current holder of the Note.

12.     SN Servicing Corporation is the servicer of the loan.

13.     As security for the Note, Defendants David Iascone and Cindy A. Iascone executed, granted and delivered a mortgage in the amount of $403,000.00 containing a power of sale to Ameriquest Mortgage Company dated March 21, 2005, and recorded in the Land Evidence Records for the Town of Johnston (the "**Mortgage**").  See **Exhibit D**.

14.     The Mortgage was assigned from Ameriquest Mortgage Company by Citi Residential Lending, Inc. to Deutsche Bank National Trust Company, as Trustee, in Trust for the registered holders of Ameriquest Mortgage Securities Inc., Quest Trust 2005-x2.

15.     There is Confirmatory assignment from Ameriquest Mortgage Company to Deutsche Bank National Trust Company, as Trustee for Quest Trust 2005-X2, asset Backed Certificates, Series 2005-X2.

16.     The Mortgage was then assigned by Ameriquest Mortgage Company by Citi Residential Lending, Inc. to Deutsche Bank National Trust Company, as Trustee for Quest Trust 200-X2, asset Backed Certificates, series 2005-X2.

17.    A Confirmatory Assignment from Ameriquest Mortgage Company to Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Quest Trust 2005-X2, Asset Backed Certificates, Series 2005-X2.

18.    The mortgage was assigned from Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Quest Trust 2005-X2, Asset Backed Certificates, Series 2005-X2 to U.S. Bank Trust National Association, as Trustee of the Igloo Series IV Trust which assignment is dated December 5, 2019 and was recorded on December 26, 2019 in Land Evidence Records for the Town of Johnston at Book 2824, Page 298.

19.    The mortgage was finally assigned from U.S. Bank Trust National Association, as Trustee of the Igloo Series IV Trust to U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust, the Plaintiff in the instant matter.

20.    Copies of the assignments of mortgage are attached hereto as **Exhibit E**.

The Mortgage is secured by the Property located in the Town of Johnston, more particularly described as follows:

That certain lot or parcel of land with all the buildings and improvements thereon, situated in the Town of Johnston, County of Providence, State of Rhode Island, laid out and designated as Lot No. 18 (eighteen) on that plat entitled, "SECTION A CHERRY HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat is recorded in the Land Evidence Records of said Town of Johnston in Miscellaneous Plan Book 2 at page 30.

Lot No. 18 (eighteen) has an appurtenant easement over Lot No. 17 (seventeen) to maintain the fill perimeter for the individual sewerage disposal system for Lot No. 18 (eighteen).

21.    U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust is the present holder of the Note and Mortgage.

22.    No person other than the parties hereto appears of record in Land Evidence Records for the Town of Johnston to have any interest in the Property.

## COUNT I

23.    Plaintiff realleges and reaffirms the allegations set forth in paragraphs 1-22 as if restated herein.

24.    Defendants are in default in the performance of the terms and conditions of the Note by reason of failure to timely tender principal and interest payments as required by the terms of the Note.

25.    As of November 19, 2020, the sum of $25,803.21 was necessary to cure the default.

26.    As a result of the default, Plaintiff is entitled to foreclose the sums due and owing in connection with the Note.

27.    As of May 4, 2021, the sum of $386,139.88 was due and owing to Plaintiff from Defendant in connection with the Note.

28.    Defendant has no defenses or right of set off with respect to the amounts due in connection with the Note, with the exception of any deficiency balance due and owning in connection with the Note which may have been discharged in bankruptcy.

29.    On or about November 19, 2020, Plaintiff, via its authorized servicer of the Mortgage, sent a notice of default and demand in accordance with the notice and default provisions of the Mortgage.

30.    On or about May 4, 2021, Plaintiff or its predecessor in interest, or authorized servicer of the Mortgage, or anyone holding under the Mortgage, by its attorneys, sent a notice of acceleration of the debt pursuant to the notice and default provisions of the Mortgage.

## COUNT II

31.    Plaintiff realleges and reaffirms the allegations set forth in paragraphs 1-26 as if restated herein.

32.    Defendants David Iascone and Cindy A. Iascone, as the present owners of the Property, are the owners of the equity of redemption of the Property.

33.    Defendants are in default in the performance of the terms and conditions of the Mortgage, namely, default in the payment of principal and interest of the Note secured by the Mortgage.

34.    Plaintiff is entitled to foreclose the Mortgage, in full or partial satisfaction of the Defendants' obligations in connection with the Note and Mortgage pursuant to their terms and applicable law.

35.    Plaintiff is entitled to foreclose the Mortgage by entry and possession and by exercise of the power of sale contained therein, in accordance with R.I.G.L. § 34-27-1, et seq.

36.    Upon information and belief and upon examination of the public records, there are no other parties with an equitable interest in the Property.

37.    Upon information and belief and upon examination of the public records, there are no other parties with a mortgage, lien or encumbrance with respect to the Property.

38.     Upon information and belief, there are no persons having any interest of ownership who are in the Military Service of the United States of America or otherwise entitled to the relief and benefits provided by the Act of Congress known as the Soldiers' and Sailors' Civil Relief Act of 1940, as amended.  See **Exhibit F.**

WHEREFORE, Plaintiff prays that the following relief enter:

1.  That an order of notice issue on this Complaint, if the Court deems appropriate;

2.  Declare that the Mortgage recorded in the Land Evidence Records for the Town of Johnston, Rhode Island is a valid lien on the Property;

3.  Declare that Defendants, David Iascone and Cindy A. Iascone, are in default of the terms and conditions of the Note and Mortgage;

4.  Enter an interlocutory decree authorizing the Plaintiff to foreclose the Mortgage recorded in the Land Evidence Records for the Town of Johnson on March 21, 2005 in book 1541 at page 66;

5.  Enter judgment in favor of Plaintiff for the sums due and owing from Defendants in connection with the Note and Mortgage with the exception of any deficiency balance due and owning in connection with the Note which may have been discharged in bankruptcy;

6.  Enter an Order authorizing Plaintiff to satisfy its Judgment from the foreclosure pursuant to the terms of the Mortgage;

7.  The Court approve the acts of the Plaintiff done and performed under the authority of any interlocutory decree authorizing a foreclosure sale and enter a final decree confirming the foreclosure sale; and

8.  Such other and further relief as this Honorable Court deems meet and just.

Respectfully submitted,

U.S. Bank Trust National Association, as
Trustee of The Bungalow Series IV Trust,
By its attorney,

*David A. Shaw*
David A. Shaw, Esq. 03497
Demerle Hoeger LLP
10 City Square
Boston, MA 02129
(617) 337-4444
(617) 337-4496 (fax)
DShaw@dhnewengland.com

DATE: April 4, 2022

# EXHIBIT A

17704

BOOK 0213 PAGE 0785

CHERRY HILL DEVELOPMENT COMPANY, a Rhode Island corporation for consideration paid, grant to    DAVID IASCONE and wife, CINDY A. IASCONE of
, as Tenants by the Entirety, not as Joint Tenants and not as Tenants in Common

### with WARRANTY COVENANTS

That certain lot or parcel of land with all the buildings and improvements thereon, situated in the Town of Johnston, County of Providence, State of Rhode Island, laid out and designated as Lot No. 18 (eighteen) on that plat entitled, "SECTION A CHERRY HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat is recorded in the Land Evidence Records of said Town of Johnston in Miscellaneous Plan Book 2 at page 30.

Lot No. 18 (eighteen) has an appurtenant easement over Lot No. 17 (seventeen) to maintain the fill perimeter for the individual sewerage disposal system for Lot No. 18 (eighteen).

Subject to real estate taxes assessed December 31, 1987.



RHODE ISLAND STAMPS FACE VALUE $ 77 00
AFFIXED AND CANCELLED
TOWN

**Witness** this    ~15th    day of    June    , 19 88 said corporation has caused these Presents to be executed and its corporate seal to be hereunto affixed by its Officer (s) duly authorized.

CHERRY HILL DEVELOPMENT COMPANY

By:

State of Rhode Island, Etc.
COUNTY OF KENT

In    Warwick    on the    15th    day of    June    19 88
before me personally appeared    Lyle S. Fain, President

of    CHERRY HILL DEVELOPMENT COMPANY
me to be the part he executing the foregoing instrument for and on behalf of said corporation, and to me known and known by
acknowledged said instrument, by    him    executed, to be    his    free act and deed, in    his    said
capacity    and the free act and deed of said corporation.    Received for Record in Johnston R.I. on

JUN 2 3 1988    1:55 A

GRANTEE  D IASCONE
25 LOVEDAY ST
PROV.  R I.

Diane R. Forand  Notary Public
My commission expires: 6-30-91

VOL **0194** PAGE **0885**

## WARRANTY DEED

PATRICIA L. GREEN, d/b/a GREEN CONSTRUCTION, of 38 Cherry Hill Road, in the Town of Johnston, County of Providence, State of Rhode Island, for consideration paid, grant to CHERRY HILL DEVELOPMENT COMPANY, a Rhode Island corporation, c/o Lyle S. Fain, Wethersfield Commons, 1 Williamsburg Circle, Warwick, Rhode Island 02886

with WARRANTY COVENANTS

### PARCEL I:

Those certain lots or parcels of land with all the buildings and improvements thereon, situated in the Town of Johnston, County of Providence, State of Rhode Island, laid out and designated as Lots Nos. 16 (sixteen), 17 (seventeen), 18 (eighteen), 19 (nineteen), and 20 (twenty) on that plat entitled, "SECTION A CHERRY HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat is recorded in the Land Evidence Records of said Town of Johnston in Miscellaneous Plan Book 2 at page 30.

Lot No. 17 (seventeen) herein is SUBJECT TO easement to maintain the fill perimeter for the individual sewerage disposal system for Lot No. 18 (eighteen) on the above plat as per attached "Plan of Proposed Sewage Disposal System, Johnston, R.I. for Emil F. & Maria C. Paquin, June 1986, Plat 20 Part of Lot 36 Record Lot 18" stamped by Caputo and Wick Ltd., Anthony A. Caputo, Registered Land Surveyor No. 1567 and approved Permit No. 8816-58.

Lot No. 18 (eighteen) has an appurtenant easement over Lot No. 17 (seventeen) to maintain the fill perimeter for the individual sewerage disposal system for Lot No. 18 (eighteen).

Lot No. 16 (sixteen) is subject to a utility easement as shown on recorded plat.

### PARCEL II:

That certain lot or parcel of land with all the buildings and improvements thereon, situated in the Town of Johnston, County of Providence, State of Rhode Island, bounded and described as follows:

Beginning at the northeasterly corner of Lot No. 20 (twenty) on that plat entitled, "SECTION A CHERRY HILL FARMS JOHNSTON RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat is recorded in the Land Evidence Records of said Town of Johnston in Miscellaneous Plan Book 2 at page 30, said point also being in the southerly line of Cherry Hill Road; thence running easterly bounding northerly by said Cherry Hill Road a distance of 8 feet; thence turning and running southerly on a line parallel with the easterly line of Lot No. 20 a distance of 150 feet; thence turning and running westerly to the southeasterly corner of Lot No. 20 a distance of 8 feet; thence turning and running northerly with the said easterly line of Lot No. 20 a distance of 150 feet to the point and place of beginning.






VOL 0194 PAGE 0686

Meaning and intending to convey and hereby conveying the westerly 8 feet in width by the entire depth of the said Grantor's land which abuts the said Lot No. 20 on the said plat.

WITNESS my hand this *3ath* day of *December*
19 *66* .

*Patricia L. Green*
PATRICIA L. GREEN

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In *Woonsocket* on the *3ath* day of *December*
19*66* , before me personally appeared PATRICIA L. GREEN, to me known and known by me to be the party executing the foregoing instrument, and she acknowledged said instrument, by her executed, to be her free act and deed.

*Edward P. Mauuey*
Notary Public
*EDWARD P. MAHONEY*.

-2-

VOL 0194 PAGE 0887



Division of Food Protection and Sanitation    BOOK190-PAGE 458 A

## RHODE ISLAND DEPARTMENT OF HEALTH

### INVERTS

| | | |
|---|---|---|
| OUT OF HOUSE | = | 55.75 |
| INTO S. TANK | = | 55.65 |
| OUT S. TANK | = | 55.40 |
| INTO D. BOX | = | 55.30 |
| OUT D. BOX | = | 55.15 |
| END TRENCH | = | 55.00 |

The cellar floor elevation shown has been suggested as a minimum based upon observed groundwater conditions. Since groundwater levels fluctuate annually, no warranty of a dry cellar is expressed or implied.

I hereby certify that there are no walls within 200' of the proposed system except as shown. I also certify there are no sub-drains within 25' of the system and none will be installed.

Strip all loam and topsoil and all trees in the area of the trenche and 10' beyond in all directions and replace with clean coarse gravel.

| PROVED | ( ) |
|---|---|
| PROVED AS CORRECTED | ( ) |
| VISE AND RESUBMIT | ( ) |
| IT APPROVED | ( ) |

cking is only for conformance with the design cept of the Project and compliance with the in-mation given in the application for SEWAGE POSAL CONSTRUCTION PERMIT NO.

SEP -9 1986                3;21 P.M.

Received for Record in Johnston, R.I. on
Witness        Town Clerk

ANTHONY A. CAPUTO

No.    1567

REGISTERED
LAND SURVEYOR

Registration Seal

PLAN OF PROPOSED
SEWAGE DISPOSAL SYSTEM

JOHNSTON, R.I.
FOR
EMIL F. & MARIA C. PAQUIN
JUNE, 1986
PLAT 20, PART OF LOT 36
RECORD LOT 18

Scale    1" = 30'        except
as noted.

DEC 31 1986    11:55 A.M.

Received for Record in Johnston R.I. on        at
Witness        Town Clerk

BOOK 0213 PAGE 0785

CHERRY HILL DEVELOPMENT COMPANY, a Rhode Island corporation
for consideration paid, grant to    DAVID IASCONE and wife, CINDY A. IASCONE
of
Entirety, not as Joint Tenants and not as Tenants in Common    , as Tenants by the

with WARRANTY COVENANTS

That certain lot or parcel of land with all the buildings
and improvements thereon, situated in the Town of Johnston,
County of Providence, State of Rhode Island, laid out and designated
as Lot No. 18 (eighteen) on that plat entitled, "SECTION A CHERRY
HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA
C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat
is recorded in the Land Evidence Records of said Town of Johnston
in Miscellaneous Plan Book 2 at page 30.

Lot No. 18 (eighteen) has an appurtenant easement over Lot
No. 17 (seventeen) to maintain the fill perimeter for the individual
sewerage disposal system for Lot No. 18 (eighteen).

Subject to real estate taxes assessed December 31, 1987.

RHODE ISLAND STAMPS FACE VALUE $77.00
AFFIXED AND CANCELLED

**Witness** this    15th    day of    June    , 19 88
said corporation has caused these Presents to be executed and its corporate seal to be hereunto
affixed by its Officer (s) duly authorized.

CHERRY HILL DEVELOPMENT COMPANY

By:

**State of Rhode Island, Etc.**
COUNTY OF KENT

In    Warwick    on the    15th    day of    June    19 88

before me personally appeared    Lyle S. Fain, President.

of    CHERRY HILL DEVELOPMENT COMPANY

to me known and known by
me to be the part he executing the foregoing instrument for and on behalf of said corporation, and
acknowledged said instrument, by    him    executed, to be    his    free act and deed, in    his    said
capacit    and the free act and deed of said corporation.    JUN 23 1988    1:55 P

GRANTEE  D IASCONE
25 LOVEDAY ST
PROV. R I

Diane R. Forand    Notary Public
My commission expires: 6-30-91

# EXHIBIT C

Loan Number: 

# ADJUSTABLE RATE NOTE
## (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

| March 21, 2005 | Orange | CA |
|---|---|---|
| Date | City | State |

220 CHERRY HILL RD, JOHNSTON, RI 02919
Property Address

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 403,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Ameriquest Mortgage Company.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of ████%. This interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS
#### (A) Time and Place of Payments
Beginning on May 1, 2005 and on the first day of every month thereafter through 04/01/2010, I will pay monthly payments of only the interest on the unpaid principal balance of the Note. Thereafter, I will make my monthly payments of principal and interest on the first day of every month beginning on 05/01/2010 until I have paid all of the principal and interest and any other charges described below that I may owe under this note. My monthly payments will be applied to interest before principal. If, on April 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at:   **505 City Parkway West, Suite 100, Orange, CA 92868**

or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ ████   This amount may change.
#### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A) Change Dates
The interest rate I will pay may change on the first day of, **April, 2007** and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
#### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If at any point in time the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.



207-1RI (02/05)

Initials: _____

1 of 3

03/21/2005 2:45:23 PM

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and two-hundred forty-nine thousandth(s)** percentage point(s) **(5.249%)** to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eight of one percent (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

(i) **Interest-Only Period.** The "interest-only period" is the period from the date of this Note through 04/01/2010. For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay only the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

(ii) **Amortization Period.** The "amortization period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than ▓▓▓▓% or less than ▓▓▓%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) **1.000%** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than ▓▓▓▓% or less than ▓▓▓%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. PREPAYMENT PRIVILEGE**

I may repay all or any part of the principal balance of this Note in accordance with the terms of this Section. A "prepayment" is any amount that I pay in excess of my regularly scheduled payments of principal and interest that the Lender will apply to reduce the outstanding principal balance on this Note in accordance with this Section.

**(A) Prepayment Made One (1.00) year(s) After the Date of this Note**

If I make a prepayment commencing on or after the One (1.00) year anniversary of the date of this Note, I may make that prepayment in full or in part, without the imposition of a prepayment charge by the Lender.

**(B) Prepayment Made Within One (1.00) year(s) of the Date of this Note**

I agree to pay Lender a prepayment charge if I make a prepayment before the One (1.00) year anniversary of the date this Note is executed. The prepayment charge I will pay will be equal to two percent (2%) on the amount by which the total prepayment exceeds twenty percent (20%) of the original principal amount of the loan.

**(C) Application of Funds**

I agree that when I indicate in writing that I am making a prepayment, the Lender shall apply funds it receives first to pay any prepayment charge and next in accordance with the order of application of payments set forth in Section 2 of the Security Instrument.

**(D) Monthly Payments**

If I make a prepayment of an amount less than the amount needed to completely repay all amounts due under this Note and Security Instrument, my regularly scheduled payments of principal and interest will not change as a result.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payment**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.



Initial:

03/21/2005 2:45:23 PM



Loan Number: ████████████

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full  as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition, to the protections given to the Note Holder under this Note, A Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note.  That the Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without the Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by applicable law as of the date of this Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.  OUR COPY** I/We acknowledge receipt of a signed copy of this Note.

**Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to. Any subsequent agreement between us regarding this Note or the instrument which secures this Note, must be in a signed writing to be legally enforceable.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Borrower  DAVID IASCONE

_____ (Seal)
Borrower  CINDY A IASCONE

_____ (Seal)
Borrower

_____ (Seal)
Borrower

297-3RI (02/05)

3 of 3

03/21/2005 2:45:23 PM

PAY TO THE ORDER OF
WITHOUT RECOURSE
AMERIQUEST MORTGAGE COMPANY

BY: _____
WAYNE LEE, President/C.E.O.

BY: _____
KAREN CHRISTENSEN, C.F.O.

# EXHIBIT D

(3

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Prepared By:Ameriquest Mortgage Company

BK# 1541 PG# 66
Inst# 51114

Nadine J DeBarros
6 Blackstone Valley Place #
305,Lincoln, RI 02865

———————————[Space Above This Line For Recording Data]———————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 21, 2005
together with all Riders to this document.
(B) "Borrower" is DAVID IASCONE and wife CINDY A IASCONE, Tenants by The
Entirety

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Ameriquest Mortgage Company

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3040 1/01 (rev. 11/02)
0114556988 - 5782
03/21/2005 2:45:23

AM6Ri (0310)

Page 1 of 16     Initials

VMP Mortgage Solutions (800)521-7291

0000011455698880301511701

BK: 1541 PG: 67

Lender is a Corporation
organized and existing under the laws of Delaware
Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated March 21, 2005
The Note states that Borrower owes Lender four hundred three thousand and 00/100
                                                                              Dollars
(U.S. $ 403,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2035
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider  [ ] Condominium Rider            [ ] Second Home Rider
[ ] Balloon Rider          [ ] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider               [ ] Biweekly Payment Rider        [ ] Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

AM6RI (0310)                    Page 2 of 16              Form 3040 1/01 (rev. 11/02)
0114556988-5782
03/21/2005 2:45:23

BK: 1541 PG: 68

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the County                    [Type of Recording Jurisdiction]
of PROVIDENCE                                    [Name of Recording Jurisdiction]:
Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: Map 20 Lot 303                which currently has the address of
220 CHERRY HILL RD                                                        [Street]
JOHNSTON                                        [City], Rhode Island 02919      [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials:_____
AM6RI (0310)                Page 3 of 15              Form 3040 1/01 (rev. 11/02)
0114556988 - 5782
03/21/2005 2:45:23

BK: 1541 PG: 69

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

AMRI (0310)
0114556988-5782
03/21/2005 2:45:23

Page 4 of 16

Initials: _____

Form 3040 1/01 (rev. 11/02)

BK: 1541 PG: 70

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall

Initials: _____

AM6RI (0310)

0114556988-5782

03/21/2005 2:45:23

Page 5 of 16

Form 3040 1/01 (rev. 11/02)

BK: 1541 PG: 71

notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal

AM6RI (0310)
0114556988-5782
03/21/2005 2:45:23

Page 8 of 16

Initials: _____

Form 3040 1/01 (rev. 11/02)



BK: 1541 PG: 72

certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

AM6RI (0310)
0114556988 -5782
03/21/2005 2:45:23

Page 7 of 16

Initials: _____
Form 3040 1/01 (rev. 11/02)



BK: 1541 PG: 73

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a

AMSRI (0310)
0114556988 -5782
03/21/2005 2:45:23

Page 8 of 16

Initials:_____

Form 3040 1/01 (rev. 11/02)

0000011455698880301511708

BK: 1541 PG: 74

condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking,

AM6RI (0310)
0114556988-5782
03/21/2005 2:45:23

Page 9 of 16

Initials:_____

Form 3040 1/01 (rev. 11/02)



BK: 1541 PG: 75

destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Initials: _____

AM6RI (0310)                          Page 10 of 16                          Form 3040 1/01 (rev. 11/02)
0114556988 - 5782

03/21/2005 2:46:23

0000011455698930318117110

BK: 1541 PG: 76

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

AM6RI (0310)

0114556988 - 5782

03/21/2005 2:46:23

Page 11 of 16

Initials: _____

Form 3040  1/01  (rev. 11/02)

BK: 1541 PG: 77

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Initials: _____

AM6RI (0310)                     Page 12 of 16                  Form 3040 1/01 (rev. 11/02)
0114556988 - 5782
03/21/2005 2:45:23



BK: 1541 PG: 78

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

AMGRI (0310)                    Page 13 of 16                    Form 3040 1/01 (rev. 11/02)
0114556988-5782
03/21/2005 2:45:23



BK: 1541 PG: 79

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. No Outstanding Automatic Orders in Domestic Relations Cases. Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

25. Homestead Estate. If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.

0114556988

Initials: _____

AM6RI (0310)                              Page 14 of 16                    Form 3040 1/01 (rev. 11/02)
0114556988 - 5782

03/21/2005 2:45:23

BK: 1541 PG: 80

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

X _____ 3-21-05 (Seal)
DAVID IASCONE                                 -Borrower

_____

X _____ 3-21-05 (Seal)
CINDY A IASCONE                               -Borrower

_____

_____(Seal)        _____(Seal)
                        -Borrower                                -Borrower

_____(Seal)        _____(Seal)
                        -Borrower                                -Borrower

_____(Seal)        _____(Seal)
                        -Borrower                                -Borrower

AM6RI (0310)                    Page 15 of 18          Form 3040 1/01 (rev. 11/02)
0114556988 - 5782

03/21/2005 2:45:23 PM


00000114556988030101711715

BK: 1541 PG: 81

**STATE OF RHODE ISLAND,**      County ss:

On this ___2̲1̲___  day of ___MARCH 2005___
           Day                   Month/Year

In ___Providence___ , in said County, before me, personally appeared

___David + Cindy Fascune___

each and all to me known and known to me to be the person(s) executing the foregoing
instrument and acknowledged said execution to be his/her/their free act and deed.



Notary Public

DAVID C. TAPALIAV

1/4/09



0114556988 - 5782

03/21/2005 2:45:23 PM

400-16 RI (12/03)            Page 16 of 16

00000114556988030151171B

BK: 1541 PG: 82

# ADJUSTABLE RATE RIDER
## (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 21st day of March , 2005  and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

220 CHERRY HILL RD, JOHNSTON, RI  02919
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  6.650 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of April, 2007  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials_____

Loan Number:  0114556988 - 5782

000001145698503021180301

610-1 (Rev 1/01)

Page 1 of 3

03/21/2005 2:45:23 PM

BK# 1541 PG# 83

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **five and two-hundred forty-nine thousandth(s)** percentage points ( **5.249 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.650% or less than 6.650%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One( 1.000 %)** from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 12.650)% or less than 6.650)%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials_____

Loan Number: 0114556988 - 5782



0000011455698803021503302

610-2 (Rev 1/01)                          Page 2 of 3

03/21/2005 2:45:23 PM

BK: 1541 PG: 84

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial Interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ 3-21-05 (Seal)    _____ 3-21-05 (Seal)
Borrower DAVID IASCONE                    Borrower CINDY A IASCONE

_____ (Seal)    _____ (Seal)
Borrower                          Borrower

Loan Number: 0114556988 - 5782

000000114556988030021603003

610-3 (Rev 1/01)                Page 3 of 3                03/21/2005 2:45:23 PM

BK: 1541 PG: 85

That certain lot or parcel of land with all the buildings and improvements thereon, situated in the Town of Johnston, County of Providence, State of Rhode Island, laid out and designated as Lot No. 18 (eighteen) on that plat entitled, "SECTION A CHERRY HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat is recorded in the Land Evidence Records of said Town of Johnston in Miscellaneous Plan Book 2 at page 30.

Lot No. 18 (eighteen) has an appurtenant easement over Lot No. 17 (seventeen) to maintain the fill perimeter for the individual sewerage disposal system for Lot No. 18 (eighteen).

Subject to real estate taxes assessed December 31, 1987.

ROBIN D. PIMENTAL
TOWN OF JOHNSTON
TOWN CLERK
03/28/2005  01:06:43PM

BK: 1541 PG: 85

That certain lot or parcel of land with all the buildings and improvements thereon, situated in the Town of Johnston, County of Providence, State of Rhode Island, laid out and designated as Lot No. 18 (eighteen) on that plat entitled, "SECTION A CHERRY HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", which plat is recorded in the Land Evidence Records of said Town of Johnston in Miscellaneous Plan Book 2 at page 30.

Lot No. 18 (eighteen) has an appurtenant easement over Lot No. 17 (seventeen) to maintain the fill perimeter for the individual sewerage disposal system for Lot No. 18 (eighteen).

Subject to real estate taxes assessed December 31, 1987.

ROBIN O. PIMENTAL
TOWN OF JOHNSTON
TOWN CLERK
03/28/2005  01:06:43PM

# EXHIBIT E

Bk: 2000 Pg: 170
INST: 00085153

| Document Prepared By: | The Space Above is Reserved for Recorder's Use Only | | | |
|---|---|---|---|---|
| Ron Meharg, 888-362-9638 | | AHCIT | 647 | 30030457 |
| When Recorded Return To: | | | | |
| DOCX | | | | |
| 1111 Alderman Dr. | Property Address: | | | |
| Suite 350 | 220 CHERRY HILL RD | | | |
| Alpharetta, GA 30005 | JOHNSTON, RI 02919 | | | |

CRef#:04/05/2009-PRef#:AU84-PUF
Date:03/24/2009-Print Batch ID:5692



## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, Ameriquest Mortgage Company by Citi Residential Lending,Inc., as Attorney in Fact, whose address is 1100 Town & Country Rd.,Orange, CA 92868, does by these presents hereby grant, bargain, sell, assign, transfer, convey, set over and deliver unto Deutsche Bank National Trust Company, as Trustee, in trust for the registered holders of Ameriquest Mortgage Securities Inc., Quest Trust 2005-X2, Asset Backed Certificates, Series 2005-X2, whose address is 1761 East St. Andrew Place Santa Ana, CA 92705-4934, the following described mortgage, securing the payment of a certain promissory note(s) for the sum listed below, together with all rights therein and thereto, all liens created or secured thereby, all obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such mortgage.

Original Borrower(s): DAVID IASCONE AND WIFE CINDY A IASCONE, TENANTS BY THE ENTIRETY

Original Mortgagee: AMERIQUEST MORTGAGE COMPANY

Date of Mortgage: 03/21/2005        Loan Amount: $403,000.00
Recording Date: 03/28/2005    Book: 1541    Page: 66    Document #: 51114
Misc. Comments: EFFECTIVE DATE: 03/23/2009.

LEGAL DESCRIPTION:
THAT CERTAIN LOT OR PARCEL OF LAND WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THE TOWN OF JOHNSTON, COUNTY OF PROVIDENCE, STATE OF RHODE ISLAND, LAID OUT AND DESIGNATED AS LOT NO. 18 (EIGHTEEN) ON THAT PLAT ENTITLED, " SECTION A CHERRY HILL FARMS JOHNSTON, RHODE ISLAND BELONGING TO EMIL F. AND MARIA C. PAQUIN BY CAPUTO AND WICK LTD. SEPTEMBER, 1985", WHICH PLAT IS RECORDED IN THE LAND EVIDENCE RECORDS OF SAID TOWN OF JOHNSTON IN MISCELLANEOUS PLAN BOOK 2 AT PAGE 30. LOT NO. 18 (EIGHTEEN) HAS AN APPURTENANT EASEMENT OVER LOT NO. 17 (SEVENTEEN) TO MAINTAIN THE FILL PERIMETER FOR THE INDIVIDUAL SEWERAGE DISPOSAL SYSTEM FOR LOT NO. 18 (EIGHTEEN).
and recorded in the official records of the Town of Johnston, State of Rhode Island affecting Real Property and more particularly described on said Mortgage referred to herein.

IN WITNESS WHEREOF, the undersigned has caused these presents to be executed on this date of 05/18/2009.

Ameriquest Mortgage Company by Citi Residential Lending,Inc., as Attorney in Fact

Tywanna Thomas
Vice President & Asst Secretary

Linda Green
Vice President & Asst Secretary

Riass1-eR2.0    01/05/2009    Copyright (c) 2009 by DOCX LLC

Bk: 2000 Pg: 171
INST: 00085153

State of GA
County of Fulton
   On this date of **05/18/2009**, before me, the undersigned authority, a Notary Public duly commissioned, qualified and acting within and for the aforementioned State and County, personally appeared the within named **Linda Green** and **Tywanna Thomas**, known to me (or identified to me on the basis of satisfactory evidence) that they are the **Vice President & Asst Secretary** and **Vice President & Asst Secretary** respectively of **Ameriquest Mortgage Company** by **Citi Residential Lending, Inc.**, as Attorney in Fact, and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and in behalf of said corporation and that said corporation executed the same, and further stated and acknowledged that they had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.
   Witness my hand and official seal on the date hereinabove set forth.

Notary Public:

Brittany Snow
NOTARY PUBLIC
Fulton County
State of Georgia
My Commission Expires
May 21, 2011

VINCENT P. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
May 22,2009 09:25:56A

11001-aR2.0   01/05/2009   Copyright (c) 2000 by DOCX LLC

Return to:
Orlans Moran PLLC
P. O. Box 5041
Troy, MI 48007-5041

BK: 2182 Ps: 196
TNPT: 00101012

*CONFIRMATORY ASSIGNMENT

Ameriquest Mortgage Company
holder of mortgage from

David Iascone and Cindy A. Iascone
to Ameriquest Mortgage Company
dated March 21, 2005

recorded with the Land Evidence Records for the Town of Johnston
Book 1541, Page 66 assigns said mortgage to Deutsche Bank National Trust Company, as Trustee for Quest Trust 2005-X2, Asset Backed Certificates, Series 2005-X2, 1525 South Belt Line Road, Coppell, TX 75019.

Citi Residential Lending Inc. as attorney in fact for Ameriquest Mortgage Company

Has caused its corporate seal to be hereto affixed and these presents to be signed, in its name and behalf by

Emmitt Wilson IV. its Assistant Secretary and Vice President

* This confirmatory assignment is being recorded to confirm the validity of the prior, previously recorded, assignment.

Citi Residential Lending Inc. as attorney in fact for Ameriquest Mortgage Company

BY:

Emmitt Wilson IV.

Assistant Secretary and Vice President

_____, 2011

STATE OF    Florida
COUNTY OF    Duval

On this 3 day of August ,2011, before me, the undersigned notary public, personally appeared Emmitt Wilson IV. as Assistant Secretary and Vice President of Citi Residential Lending Inc. as attorney in fact for Ameriquest Mortgage Company, who I have personal knowledge of identity, to be the person whose name is signed on the proceeding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

Official Signature and Seal of Notary
My Commission Expires: April 11, 2015

LUBICA V SIMON
MY COMMISSION # EE063165
EXPIRES April 11, 2015
(407) 398-0153    FloridaNotaryService.com

VINCENT F. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
Dec 27, 2011 02:06:15P

RE: 220 Cherry Hill Road, Johnston, RI 02919

# RHODE ISLAND

PREPARED BY SECURITY CONNECTIONS
WHEN RECORDED MAIL TO:
*SECURITY CONNECTIONS INC.*
*240 TECHNOLOGY DRIVE*
*IDAHO FALLS, ID 83401*
*PH:(208)528-9895*
*ATT: TERRILL NIELSON*

Bk:    2254   Ps:    243
INST:   00106871

TOWN OF *JOHNSTON*
Loan.No                [E35]

Pool.No                          Space above for recorder's use
|█▌█▐█▌█▐█|

Assignment-Interv.-Recorded
## ASSIGNMENT OF MORTGAGE OR DEED OF TRUST

FOR VALUE RECEIVED, *AMERIQUEST MORTGAGE COMPANY, BY CITI RESIDENTIAL LENDING,*
*INC., ITS ATTORNEY IN FACT,*

located at *1525 S. BELTLINE RD., COPPELL, TX 75019*
does hereby grant, assign, transfer and set over unto *DEUTSCHE BANK NATIONAL*
*TRUST COMPANY, AS TRUSTEE FOR QUEST TRUST 2005-X2, ASSET BACKED CERTIFICATES,*
*SERIES 2005-X2*

located at  *1761 EAST ST. ANDREW PLACE   SANTA ANA, CA 92705-4934*
                                                          its successors
and assigns a certain Mortgage or Deed of Trust dated   *MARCH 21, 2005*
executed by *DAVID IASCONE AND WIFE CINDY A IASCONE, TENANTS BY THE ENTIRETY*
                                                          as Grantor(s),
and recorded in Volume  *1541*          Page No. *66*          Instrument No. *51114*
of the Mortgage or Deed of Trust records in the office of the Town Clerk in the
Town of *JOHNSTON*          State of Rhode Island on the  *29th* day of  *MARCH 2005*
Time of recording *1:06:43 PM*          .
Property Address: *220 CHERRY HILL RD JOHNSTON, RI 02919*

|█▌█▌█▐█▌█▐█|
Loan No.

(NMRI.RI)                    Page 1 of 2
*C=N.245.0142*
*P=S.002.00021.101*        *J=am8040112ai.s.14171*

Loan.No [E35]

TOGETHER with all rights accrued or to accrue to said MORTGAGE OR DEED OF TRUST.

DATED **SEPTEMBER 26, 2012**.

AMERIQUEST MORTGAGE COMPANY, BY CITY
RESIDENTIAL LENDING, INC., ITS ATTORNEY IN FACT

Bk: 2254 Pg: 244
INST: 00106871

Witness, CRISTINA HUITRON

SARAH HIX
VICE PRESIDENT

Witness, ALYSSA WELLS

STATE OF **IDAHO**

COUNTY OF **BONNEVILLE**

ss
VINCENT P. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
Nov 28,2012 08:56:29A

On **SEPTEMBER 26, 2012**, before me, the undersigned, a Notary Public in and
for said County and State, personally appeared **SARAH HIX**
known to me to be the person who executed the within instrument as the
**VICE PRESIDENT**, and
known to me to be the person who executed the within instrument as the
of the Corporation that executed the
within instrument and acknowledged to me that the Corporation executed the within
instrument pursuant to its by-laws or a resolution of its board of directors.
WITNESS my hand and official seal.

EMMETT GREEN
NOTARY PUBLIC
STATE OF IDAHO

**EMMETT GREEN** (COMMISSION EXP. 05-31-18)
NOTARY PUBLIC

(NMRI.RI.2)                     Page 2 of 2
C=s.245.0142
P=S.002.00021.101        J=am8040112a1.s.14171

APN #: MAP: 20 LOT: 303
Prepared By: David Santa / HK
When Recorded Mail To:
OCWEN LOAN SERVICING, LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407
Phone Number: 561-682-8835

BK # 2372 Ps # 317
INST # 00116409

## CONFIRMATORY ASSIGNMENT OF MORTGAGE
### RHODE ISLAND

***THIS CONFIRMATORY ASSIGNMENT OF MORTGAGE IS INTENDED TO CLARIFY THE ASSIGNEE NAMED IN THE ORIGINAL ASSIGNMENT RECORDED WITH SAID REGISTRY OF DEEDS ON MAY 22, 2009 IN BOOK: 2000, PAGE: 170 AND REPLACES THE CONFIRMATORY ASSIGNMENT RECORDED ON DECEMBER 27, 2011 IN BOOK: 2182, PAGE: 196***

This ASSIGNMENT OF MORTGAGE from AMERIQUEST MORTGAGE COMPANY, whose address is c/o Ocwen Loan Servicing, LLC. 5720 Premier Park Dr, West Palm Beach, FL 33407 ("Assignor") to DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR AMERIQUEST MORTGAGE SECURITIES INC., QUEST TRUST 2005-X2, ASSET BACKED CERTIFICATES, SERIES 2005-X2, whose address is c/o Ocwen Loan Servicing, LLC. 5720 Premier Park Dr, West Palm Beach, FL 33407 ("Assignee").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor does by these presents hereby grant, bargain, sell, transfer and set over unto the Assignee, its successors, transferees and assigns forever, all of the right, title and interest of said Assignor in and to the following instrument describing land therein, duly recorded in the Office of the Public Records of JOHNSTON TOWN State of RHODE ISLAND, as follows:

Mortgagor: DAVID IASCONE AND CINDY A. IASCONE
Mortgagee: AMERIQUEST MORTGAGE COMPANY
Document Date: MARCH 21, 2005
Amount: $ 403,000.00
Recording Date: MARCH 28, 2005
Book/Volume/Docket/Liber: 1541
Page/Folio: 66
Instrument : 51114
Property address: 220 CHERRY HILL RD, JOHNSTON, RI 02919
Property described as follows:

*FOR A COMPLETE LEGAL DESCRIPTION SEE ABOVE REFERENCED RECORDED MORTGAGE*

APN #: MAP: 20 LOT: 303
Prepared By:  David Santa / HK
When Recorded Mail To:
OCWEN LOAN SERVICING, LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407
Phone Number: 561-682-8835

Bk: 2372 Pg: 318
INST: 00116409

This Assignment is made without recourse, representation or warranty.
IN WITNESS WHEREOF the Assignor has caused these presents to be executed in its name, by its proper officer thereunto duly
authorized, the ___10th___ day of ___June_____ , 2014

AMERIQUEST MORTGAGE COMPANY
BY ITS ATTORNEY IN FACT AND SERVICER IN FACT
OCWEN FEDERAL BANK/FSB
BY ITS SUCCESSOR IN INTEREST
OCWEN LOAN SERVICING, LLC

BY: _____

NAME:  **Jason Ayers**
TITLE:  Authorized Signer
Power of Attorney recorded on : 11/10/2003
Book: 1320      Page: 217
Instrument number : 35066

Signed, sealed and delivered in the presence of:

(1) _____
     **Christian J. Ferrer**

(2) _____
     **Joe Simmons**

STATE OF FLORIDA        )
                        )ss.
COUNTY OF PALM BEACH    )
The foregoing instrument was acknowledged before me this ___10th___ day of ___June_____ , 2014, by
___Jason Ayers___ Authorized Signer at Ocwen Loan Servicing, LLC, Successor In Interest to Ocwen
Federal Bank, FSB, Attorney In Fact and Servicer in Fact for AMERIQUEST MORTGAGE COMPANY, on behalf of the
company. He/She is personally known to me.

Notary Public
State of Florida        **Ivelka Angeles**

Notary Public State of Florida
Ivelka Angeles
My Commission FF 062016
Expires 07/23/2018

VINCENT P. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
Jun 25, 2014 11:03A

Bk: 2824 Pg: 298
INST: 00149297

Prepared By and Return To:

Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

Loan No █████████

Space above for Recorder's use



10660198

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR AMERIQUEST MORTGAGE SECURITIES INC., QUEST TRUST 2005-X2 ASSET BACKED CERTIFICATES, SERIES 2005-X2, whose address is 1761 E. SAINT ANDREW PLACE, SANTA ANA, CA 92705, (ASSIGNOR), does hereby grant, assign and transfer to U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE IGLOO SERIES IV TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNEE) its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: 3/21/2005
Original Loan Amount: $403,000.00
Executed by (Borrower(s)): DAVID IASCONE & CINDY A IASCONE
Original Lender: AMERIQUEST MORTGAGE COMPANY
Filed of Record: In Mortgage Book/Liber/Volume 1541, Page 66
Document/Instrument No: 51114 in the Recording District of JOHNSTON TOWNSHIP, RI, Recorded on 3/28/2005.

Property more commonly described as: 220 CHERRY HILL RD, JOHNSTON, RHODE ISLAND 02919

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: 12/5/2019

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR AMERIQUEST MORTGAGE SECURITIES INC., QUEST TRUST 2005-X2 ASSET BACKED CERTIFICATES, SERIES 2005-X2, BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT

By: MURAT DENIZ                                     Witness Name: DAVID SUNDWALL
Title: VICE PRESIDENT

Bk: 2824 Ps: 299
INST: 00149297

---

A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

---

State of        **FLORIDA**
County of      **PINELLAS**

On 12/5/2019, before me, JAMIE OLGIA, a Notary Public, personally appeared MURAT DENIZ, VICE PRESIDENT of/for MERIDIAN ASSET SERVICES, LLC, AS ATTORNEY-IN-FACT FOR DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR AMERIQUEST MORTGAGE SECURITIES INC., QUEST TRUST 2005-X2 ASSET BACKED CERTIFICATES, SERIES 2005-X2, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of FLORIDA that the foregoing paragraph is true and correct. I further certify MURAT DENIZ, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): JAMIE OLGIA
My commission expires: 04/12/2020

JAMIE OLGIA
MY COMMISSION # FF 981860
EXPIRES: April 12, 2020
Bonded Thru Budget Notary Services

---

BK: 2869 PG: 27
INST: 00152382

Prepared By and Return To:

Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

Space above for Recorder's use

Loan No ███████

12323093

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES IV TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNOR), does hereby grant, assign and transfer to US BANK TRUST N.A., AS TRUSTEE OF THE BUNGALOW SERIES IV TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: 3/21/2005
Original Loan Amount: $403,000.00
Executed by (Borrower(s)): DAVID IASCONE & CINDY A IASCONE
Original Lender: AMERIQUEST MORTGAGE COMPANY
Filed of Record: In Mortgage Book/Liber/Volume 1541, Page 66
Document/Instrument No: 51114 in the Recording District of Johnston Township, RI, Recorded on 3/28/2005.

Property more commonly described as: 220 CHERRY HILL RD, JOHNSTON, RHODE ISLAND 02919

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: 6/2/2020

US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES IV TRUST, BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT

By: KATHRYN CREMER
Title: VICE PRESIDENT

Witness Name: ADLY SAWIRES

Bk= 2869 Pg= 28
INST= 00152382

A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of        **FLORIDA**
County of      **PINELLAS**

On 6/2/2020, before me, MARK CASTILLO, a Notary Public, personally appeared KATHRYN CREMER, VICE PRESIDENT of/for MERIDIAN ASSET SERVICES, LLC, AS ATTORNEY-IN-FACT FOR US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES IV TRUST, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of FLORIDA that the foregoing paragraph is true and correct. I further certify the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization and that KATHRYN CREMER, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): MARK CASTILLO
My commission expires: 2/24/2024

Mark Castillo
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG951823
Expires 2/24/2024

VINCENT P. BACCARI JR.
TOWN OF JOHNSTON
TOWN CLERK
Jun 17,2020 10:40A

Exhibit F

Case 1:22-cv-00140-JJM-PAS    Document 1    Filed 04/04/22    Page 55 of 58 PageID #:
Department of Defense Manpower Data Center    55    Results as of : Apr-04-2022 09:59:19 AM

SCRA 5.12



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:             XXX-XX-3058
Birth Date:
Last Name:       IASCONE
First Name:      CINDY
Middle Name:     A
Status As Of:    Apr-04-2022
Certificate ID:  2PZ91JXNFMFVB25

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligbility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

Department of Defense Manpower Data Center

Results as of : Apr-04-2022 09 58:30 AM

SCRA 5.12



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:              XXX-XX-1106
Birth Date:
Last Name:        IASCONE
First Name:       DAVID
Middle Name:
Status As Of:     Apr-04-2022
Certificate ID:   XQQ4727TVYWRNP0

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.